432 A.2d 587

COMMONWEALTH of Pennsylvania

v.

**Dorine McELLIGOTT, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 23, 1981.

Decided July 8, 1981.

Joseph J. Gale, Joseph F. Iracki, Wilkes-Barre, for appellant.

Chester B. Muroski, Dist. Atty., J. P. Giovannini, Jr., Asst. Dist. Atty., for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

KAUFFMAN, Justice.

Appellant, Dorine McElligott, was arrested on February 20, 1979, and charged with criminal homicide in the shooting death of Michele Yale. Her trial before a jury in the Court of Common Pleas of Luzerne County commenced on June 4, 1979, but was aborted by declaration of mistrial on June 11, 1979, and a new trial was set for September 10, 1979. On that date appellant entered a plea of guilty generally to criminal homicide.[1] The plea, however, was withdrawn with the approval of the court before sentencing, and appellant obtained new counsel. A pre-trial motion to quash the information on double jeopardy grounds was heard on Janu-

---

1. After hearing the evidence, the court accepted appellant's plea and found her guilty of third degree murder.

ary 14, 1980 and denied on January 16, 1980. An immediate appeal was taken to this Court pursuant to our holding in *Common‹ ‹alth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977).[2]

Appellant argues that because of alleged prosecutorial overreaching during her first trial, retrial would unconstitutionally place her in jeopardy for a second time.[3] The mistrial which ended the original proceeding resulted from the Commonwealth's failure to provide appellant in a timely manner with the results of a neutron activation test.[4] Although the mistrial was declared *solely* because of appellant's objection to the Commonwealth's delay in producing the neutron activation test results, her present counsel has enlarged the original objection and supports his motion to quash the information by alleging that the prosecution's

2. *Bolden* held that an order denying a motion to dismiss charges on double jeopardy grounds is immediately appealable.

3. In *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980), we set forth the circumstances under which prosecutorial misconduct would be the basis for a claim of former jeopardy, thus precluding retrial:

The United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. See *United States v. Dinitz*, 424 U.S. 600, 611 [96 S.Ct. 1075, 1081, 47 L.Ed.2d 267] (1976). Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. See *Lee v. United States*, 432 U.S. 23, 32 [97 S.Ct. 2141, 2146, 53 L.Ed.2d 80] (1977). *United States v. Dinitz, supra*, 424 U.S. at 611 [96 S.Ct. at 1081.] In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

490 Pa. at 341, 416 A.2d at 500.

4. A neutron activation test is taken for the purpose of detecting gunpowder traces on the hands or body of a person suspected of having fired a gun. The test was performed on February 20, 1979, the day of the shooting, and the results of the test were reported to the district attorney's office on March 21, 1979. Counsel for the defense, however, was not advised of the test and its results until June 11, 1979, during appellant's trial, at which time appellant moved for and was granted a mistrial.

failure to provide the defense with four investigative reports in a timely manner evidenced a pattern of intentional bad faith misconduct, or, in the alternative, that it evidenced gross negligence which, under double jeopardy principles, should be sufficient to bar retrial.[5]

Despite the fact that she had made several definitively inculpatory statements to the police shortly after her arrest,[6] appellant's allegation of bad faith misconduct rests essentially upon the premise that the district attorney deliberately withheld the neutron activation and fingerprint test results in order to force her to admit the shooting and proceed on a theory of self-defense or accident. The Commonwealth contends, however, that the assistant district attorney responsible for the conduct of appellant's prosecution believed that the results of the neutron activation and fingerprint tests were not exculpatory, but rather were inconclusive and thus inconsequential to either the prosecution or the defense. At a hearing below on the motion to quash now before us, the

5. The four reports are: (1) the neutron activation test; (2) a fingerprint report on the alleged murder weapon; (3) a toxicology study; and (4) a fingernail clipping examination.

The record discloses that the fingerprint report, which revealed that appellant's fingerprints were not found on the weapon used in the crime, was not made available to appellant until June 6, 1979, the first day of trial after jury selection was completed, although it had been brought to the attention of the prosecution on June 1, 1979.

The toxicology report (analysis of a blood sample taken from the victim) was requested shortly after the crime but was not completed until June 4, 1979, at which time it was given to defense counsel; the fingernail clipping report was requested and received by the prosecution on June 7, 1979, and was made available to the defense on the following day. Appellant argues that the delay in preparation of the toxicology report and the timing of the fingernail clipping report add cumulative weight to her claim of bad faith, but she does not articulate how she may have been prejudiced thereby, nor do we see any connection between those two tests and the information which had been available to the Commonwealth but remained undisclosed until the midst of trial. In any event, the toxicology and fingernail clipping reports related only to the theory of self-defense and not to the issue of whether appellant did the shooting.

6. On the day of her arrest, for example, appellant voluntarily dictated and signed a statement admitting that she shot the victim, and, in fact, demonstrated to the interviewing officer how she had held the gun. N.T. Sept. 10, 1979 pp. 71–73.

prosecutor testified that it was his understanding that the test results were of no value at all, and his failure to bring them to defense counsel's attention was totally inadvertent.[7]

The record, in fact, does indicate that the tests were inconclusive. Although appellant's hands did not reveal gunpowder traces, neither did the hands of the state trooper who test-fired the weapon as part of the laboratory analysis. The absence of appellant's fingerprints on the gun is, under the facts here presented, similarly inconclusive rather than exculpatory. Since appellant had admitted the shooting to police shortly after her arrest, the prosecutor had no reason to attribute significance to the inconclusivity of the test results, for he, like defense counsel, accepted the veracity of appellant's admissions.

Nevertheless, at the hearing on appellant's motion for mistrial following the disclosure of the neutron activation test results, the trial judge accepted defense counsel's argument that the laboratory report might have been utilized to support a theory that appellant did not, in fact, do the shooting, or at the least would have made proof of that element more difficult if contested. The court thus concluded that under the holding of the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and subsequent Supreme Court decisions, the prosecution was obligated promptly to provide the defense with the test results, and that its failure to do so required a declaration of mistrial.[8]

7. He recounted that he received the neutron activation test results, decided they were useless, placed them in his file, and then simply forgot about them until well into appellant's trial. Although he similarly disregarded the fingerprint report, he did advise defense counsel of its existence at the start of the trial a few days after it had been brought to his attention. Upon receiving the latter report, appellant's counsel made no objection to the delay in its delivery.

8. We make no comment on whether mistrial was constitutionally mandated under the circumstances of this case. Cf. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (although self-defense claimed by defendant, no due process error where prosecution failed to advise defense of victim's previous criminal record

There is not a scintilla of evidence here, however, pointing to deliberate prosecutorial overreaching. Although a review of the record suggests that the prosecutor may have been deficient in judgment or knowledge of the law, we can hardly describe his behavior as intentional bad faith misconduct. The test results were not *per se* exculpatory, but only could have been used in connection with a theory that appellant did not fire the gun. Because that fact already had been admitted, it was by no means unreasonable for the prosecution to have concluded that the information would be of no use to the defense. The mistrial was granted simply because the *possibility* of an alternate strategy denying the shooting had been precluded by the failure to disclose the non-inculpatory test results.

Significantly, even after the test information was received by the defense and mistrial was declared, appellant rejected the alternate strategy and entered a plea of guilty. Although not dispositive, this conduct certainly lends support to the district attorney's assertion of a good faith belief that the information was worthless.[9]

for assaults because prior record shed no light on victim's character that was not already apparent from uncontradicted evidence).

9. In *United States v. Keogh*, 391 F.2d 138 (2d Cir. 1968), the court refused to overturn a conviction and grant retrial on the basis of the record, and instead remanded for an evidentiary hearing to determine whether due process had been denied where the prosecutor failed to inform defense counsel of certain F.B.I. reports relating to financial transactions of an intermediary who allegedly conveyed a bribe to the defendant. In his Opinion, Judge Friendly noted:

Deliberate prosecutorial misconduct is presumably infrequent; to invalidate convictions in the few cases where this is proved, even on a fairly low showing of materiality, will have a relatively small impact on the desired finality of judgment and will *deter* conduct undermining the integrity of the judicial system. . . . *Failure to appreciate the use to which the defense could place evidence in the prosecution's hands, or forgetfulness that it exists when a development in the trial has given it a new importance, are quite different.* Since this must happen to the most scrupulous prosecutors and *the issue of deterrence scarcely arises,* the problems of the courts and the wider interests of society unite to require a substantially higher probability that disclosure of the evidence to the defense would have altered the result. . . .

391 F.2d at 147–48. (Emphasis supplied)

██ Unless his actions could be shown to have been a deliberate attempt to provoke a mistrial or to have been undertaken in bad faith to prejudice or harass the appellant, the prosecutor's error in judgment or negligence will not preclude a retrial. The remedy of discharge without a fair and complete fact-finding procedure is extreme and will not be invoked absent *deliberate bad faith prosecutorial misconduct.* Cf. *Commonwealth v. Virtu,* 495 Pa. 59, 432 A.2d 198 (1981). While intentional prosecutorial misconduct constitutes a dangerous threat to the very integrity of our judicial system, the case before us at most presents no more than prosecutorial error of the sort which occurs from time to time as an inevitable part of the adjudicative process. In *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the seminal case in this area, the United States Supreme Court noted:

[W]here circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error.

424 U.S. at 607, 96 S.Ct. at 1079, quoting *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971). As we here find no evidence of deliberate prosecutorial bad faith, a new trial is not precluded by the principles of double jeopardy and will provide appellant with completely adequate relief.

Accordingly, the trial court's order denying appellant's motion to quash is affirmed.

NIX and LARSEN, JJ., concurred in the result.