**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**David W. ANDERSON, Appellee.**

Superior Court of Pennsylvania.

Argued June 7, 2011.

Filed Nov. 3, 2011.

James P. Carbone, Assistant District Attorney, Franklin, for Commonwealth, appellant.

Alexander H. Lindsay, Butler, for appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., MUSMANNO, BENDER, GANTMAN, DONOHUE, ALLEN, LAZARUS, and OLSON, JJ.

OPINION BY GANTMAN, J.:

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Venango County Court of Common Pleas, which granted Appellee, David W. Anderson's motion to dismiss on double jeopardy grounds, based on prosecutorial misconduct. The Commonwealth asks us to determine whether the trial court erred in dismissing the case pursuant to the double jeopardy clause of the Pennsylvania Constitution, where the prosecutorial misconduct occurred after remand for a new trial, but before the retrial. We hold prosecutorial misconduct occurring before a re-

trial can serve to bar the retrial, under the double jeopardy clause of the Pennsylvania Constitution. We further hold the trial court properly granted Appellee's motion to dismiss, because the prosecutor intentionally committed the misconduct to prejudice Appellee to the point of denying him a fair trial. Accordingly, we affirm the order granting Appellee's motion to dismiss.

This Court previously set forth the relevant facts of this appeal as follows:

[Appellee] was employed as a Residential Service Aide ("RSA"), a caregiver, at the Polk Center State Hospital, a facility that houses mentally retarded patients. D.M., T.C., and J.L. were residents of the hospital and function at approximate mental age levels ranging from six to eight years old. [Appellee] cared for the three residents at various times throughout his employment at the hospital. The following sets out the claims of each resident.

1. The incidents are:

*D.M.*

On or about March 1, 2000, Robert Lake, a coworker of [Appellee], observed [Appellee] with his pants down and buttocks exposed in the presence of D.M. in an abandoned cottage at the facility. Lake reported what he saw and the hospital began an internal investigation.

*T.C.*

During the investigation, another coworker of [Appellee], Kelly McCullon, reported an incident she saw in February 2000. McCullon observed [Appellee] in a restroom with resident T.C., with his shorts lowered and T.C.'s head positioned alongside [Appellee's] legs.

When [Appellee] realized McCullon had entered the restroom, he appeared startled and immediately raised his trousers. T.C. does not require assistance in the bathroom because he is totally independent. A few days after the incident, [Appellee] approached McCullon and stated he was worried about something somebody may have seen, adding that seeing something is one thing and proving it is another.

T.C. reported to RSA McCullon that [Appellee] performed unwanted sexual acts with him. T.C. stated that [Appellee] rubbed his penis in the bathroom and T.C. placed his mouth on [Appellee's] penis at Polk Center. Afterwards, [Appellee] warned T.C. not to tell anyone what happened or he would get in trouble.

*J.L.*

The investigation continued and resident J.L. came forward to report misconduct by [Appellee]. J.L. reported that [Appellee] performed oral sex upon him and masturbated him on several occasions at the facility's swimming pool. In addition, J.L. revealed that while on a Special Olympics trip, [Appellee] performed oral sex on him in a Somerset County hotel. J.L. stated he did not reveal any of the incidents because [Appellee] threatened to beat him up if he did. The events at the hotel were corroborated by another Polk Center resident, Henry Garner, who was staying in the room with J.L. and [Appellee]. Garner observed J.L. playing with [Appellee's] penis and was reluctant to report the act because of threats made by [Appellee].

## 2. The Police Investigation and the Trial

In March 2000, following the internal investigation, Polk Center State Hospital referred the case to the police.

Pennsylvania State Trooper Brian Mason was assigned as the investigating officer. Trooper Mason interviewed [Appellee] about the act that had been reported by [Appellee's] coworker Robert Lake. [Appellee] allegedly admitted to the act of indecent assault on resident D.M. On April 28, 2000, after the police reviewed the internal investigation of the hospital and interviewed the alleged victims, the Venango County district attorney's office filed criminal charges against [Appellee] for multiple counts of involuntary deviate sexual intercourse ("IDSI") and indecent assault involving these three alleged victims.

On June 30, 2000, the Honorable District Justice Douglas Gerwick ruled that resident D.M. was incompetent to testify and dismissed the charges involving him. On October 20, 2000, a second preliminary hearing was held and District Justice Gerwick again held that D.M. was incompetent to testify. On January 25, 2001, the Commonwealth re-filed charges involving resident D.M. and a preliminary hearing was held on January 31, 2001. At the hearing, the district justice found D.M. to be competent to testify and the Commonwealth was allowed to proceed on charges involving D.M.

The procedure regarding residents J.L. and T.C. is as follows. On June 30, 2000, District Justice Gerwick allowed the charges involving these residents to go forward. On February 1, 2001, charges involving all the residents (D.M., T.C. and J.L.) were consolidated ... and trial was set for February 5, 2001.

On February 5, 2001, the day trial began, [Appellee's] motion under Rule 315 for dismissal of charges involving D.M. was denied. On February 13, 2001, the jury found [Appellee] guilty of indecent

assault but not of IDSI from the incident involving D.M. The jury was deadlocked as to the charges involving J.L. and T.C. On March 26, 2001, [Appellee] was sentenced to incarceration of three months to 24 months less one day in the Venango County Jail for the conviction of indecent assault on D.M.

\*     \*  ,     \*

[Appellee] was retried on the charges involving residents J.L. and T.C.—the charges on which the jury had deadlocked in the first trial. Following the second trial, on September 17, 2001, the jury found [Appellee] guilty of one count of indecent assault on T.C. On the charges involving J.L., the jury found [Appellee] guilty of IDSI for the incident in Somerset County, as well as finding [Appellee] guilty of indecent assault at both the hospital and in Somerset. On January 24, 2002, the court sentenced [Appellee] to five to 15 years' imprisonment for the IDSI conviction and six years of probation for the three counts of indecent assault.

[Appellee] filed timely notices of appeal from both judgments of sentence.

*Commonwealth v. Anderson,* No. 746 WDA 2001, unpublished memorandum at 2–6, 855 A.2d 127 (Pa.Super. filed April 21, 2004) (internal citations to the record omitted).

On appeal, this Court reversed the conviction related to D.M., concluding Appellee had "suffered prejudice by the eleventh-hour amendment" of the charges. *Id.* at 10. Accordingly, this Court discharged Appellee with respect to D.M. This Court also reversed and remanded for a new trial on the charges related to T.C. and J.L. Specifically, this Court determined the prosecutor had engaged in misconduct during his closing argument, utilizing intemperate language and making a hand gesture to simulate masturbation in the direction of Appellee and defense counsel. Nevertheless, this Court declined to discharge the matter on double jeopardy grounds:

> Our review of the record reflects no justification for the behavior of the prosecutor during his closing argument. The only purpose of the conduct appears to be to prejudice the jury, forming in their minds a fixed bias and hostility toward [Appellee] so that the jury could not weigh the evidence objectively and render a true verdict. Such conduct, from the record, appears to have been undertaken intentionally to prejudice [Appellee] to the point of denying him a fair trial. If so, the double jeopardy clause of the Pennsylvania Constitution would bar retrial of any charges prosecuted at the second trial. [*Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992) ]. On the other hand, we do not have before us the egregious circumstances of *Smith.* . . . While the prosecutor's behavior in [Appellee's] case was outrageous, it did not rise to the level of the intentional prejudice of the prosecutor in *Smith.* Thus, we reverse and remand for a new trial.

*Id.* at 14–15. The Commonwealth filed a petition for allowance of appeal, which our Supreme Court denied on February 22, 2005. *Commonwealth v. Anderson,* 855 A.2d 127 (Pa.Super.2004) (unpublished memorandum), *appeal denied,* 582 Pa. 668, 868 A.2d 1196 (2005) ("*Anderson I* ").

Upon remand, the court conducted jury selection on September 6, 2005. Immediately following jury selection, the court conducted a competency hearing to reevaluate T.C. and J.L. On September 8, 2005, the court found T.C. and J.L. were incompetent to testify, and it dismissed the jury. The Commonwealth timely filed a notice of appeal on October 6, 2005. On appeal, this Court determined the trial court had

abused its discretion in failing to apply the factors in Pa.R.E. 601 to evaluate the witnesses' competency. Consequently, this Court reversed and remanded the case for trial. *Commonwealth v. Anderson,* 927 A.2d 647 (Pa.Super.2007) (unpublished memorandum) ("*Anderson II* ").

On September 26, 2007, Appellee filed a motion for another competency hearing. In it, Appellee alleged "the Commonwealth, by way of its Assistant District Attorney, has had substantial meetings with [the] witnesses prior to each hearing in which the witnesses testified." (Motion for Competency Hearing, filed 9/26/07, at 5). Appellee argued the prosecutor used these meetings to "coach" the witnesses. Moreover, at a 2005 competency hearing, the prosecutor stated, "I can get [T.C.] to say anything." (*Id.* at 6). Thus, Appellee requested a new competency hearing "to test or challenge each witness' **independent** ability to recall the alleged events on his own. . . ." (*Id.*) (emphasis in original). Appellee further requested that the court prohibit the Commonwealth from interviewing the witnesses prior to the competency hearing, "to minimize the ever-present issue of taint" and "to make a valid determination of each witness' independent ability to recall the alleged events." (*Id.* at 7). The court granted Appellee's motion and scheduled the competency hearing to occur at the pretrial conference.

On October 29, 2007, the court issued an additional order, placing the following restrictions on the prosecutor's ability to interview the witnesses prior to the competency hearing:

> In preparation for [the competency] hearing, the motion of the defense counsel for some form of protection concerning "taint" is granted. The court sees no impediment to the Commonwealth if we order and we do hereby order that the [prosecutor] when interviewing the four stated witnesses prior to the competency hearing, will have with him preferably [the psychologist from the Polk Center], who has been a counselor for these witnesses, but if not her some other responsible person at Polk Center, such as an RSA. Interviews will not be conducted unless such person is present. Counsel for the Commonwealth will keep a log showing when the interviews occurred and who was present. This is only up to the point of the competency hearing.

(Order, entered 10/29/07, at 2). The court also ordered the Commonwealth to deliver to defense counsel any assessments [1] of the witnesses conducted by the Polk Center after January 1, 2004. Additionally, the court directed the parties to provide a witness list to opposing counsel at least two weeks before jury selection.

On November 8, 2007, the court scheduled the competency hearing for February 1, 2008. On February 1, 2008, the court continued the matter, because an ice storm prevented T.C. and J.L. from attending the hearing. The court rescheduled the hearing for April 4, 2008. The court also noted that the October 29, 2007 order "shall remain in full force and effect until further Order of Court." (Order, dated 2/1/08, at 2). Following an additional continuance, the court conducted the competency hearing on June 6, 2008.

At that hearing, it was discovered that [the prosecutor] not only did not comply with any of the above referenced requirements contained in [the court's] October 29, 2007 Order, he also committed

---

1. Although the order referred to "competency" assessments, the trial court subsequently determined that the parties had contemplated the delivery of mental "capacity" assessments. (N.T. Competency Hearing, 6/6/08, at 119, 127, 137–38).

egregious prosecutorial misconduct which was designed to subvert the truth-seeking process and deny [Appellee] of his right to a fair trial. Most troubling, and indeed egregious, [the prosecutor] met with J.L. six days before the competency hearing for several hours; watched a Pittsburgh Penguins hockey game with J.L.; told J.L. what questions were going to be asked at the hearing, along with their answers; did ask those questions at the competency hearing; and was then repeatedly dishonest with [the court] in an attempt to conceal his misconduct and convict [Appellee] at any cost.

(Trial Court Opinion, entered February 6, 2009, at 12–13). In light of the prosecutor's misconduct, the court rescheduled the competency hearing for July 31, 2008.

On July 16, 2008, Appellee filed several motions to dismiss, including a motion to dismiss on double jeopardy grounds. In his motion, Appellee cited specific instances of prosecutorial misconduct, including the prosecutor's meeting with J.L. to rehearse questions and answers for the competency hearing. Appellee also complained that the prosecutor failed to keep a log of his meeting with J.L., failed to provide mental capacity reports, failed to provide certain expert reports, and failed to provide a witness list. Appellee claimed the prosecutor's behavior caused Appellee to suffer unfair prejudice, and the pattern of prosecutorial misconduct throughout the history of the proceedings warranted the dismissal of the charges on double jeopardy grounds.

On July 30 and 31, 2008, the court conducted hearings on Appellee's various dis-

missal motions. Following the hearings, the court ordered the parties to submit briefs regarding the motion to dismiss on double jeopardy grounds. On September 4, 2008, the court continued the matter indefinitely, as it considered the parties' briefs. By opinion and order entered February 6, 2009, the court granted Appellee's motion to dismiss on double jeopardy grounds.

The Commonwealth timely filed its notice of appeal on March 3, 2009.[2] On October 22, 2010, a panel of this Court reversed (with one dissent) and remanded for trial. On November 5, 2010, Appellee requested *en banc* reargument, which this Court granted on January 6, 2011.

The Commonwealth raises the following issue for our review:

WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW BY INVOKING THE DOUBLE JEOPARDY CLAUSE OF THE PENNSYLVANIA CONSTITUTION AS A BAR TO REPROSECUTION TO REMEDY PERCEIVED PROSECUTORIAL TRANSGRESSIONS OCCURRING AFTER THE CASE WAS REMANDED FOR A NEW TRIAL AND BEFORE RETRIAL, AND THAT DID NOT INVOLVE ANY PREJUDICE TO [APPELLEE'S] PRIOR TRIAL COURT PROCEEDINGS?

(Commonwealth's Brief at 4).

Initially we observe:

"An appeal grounded in double jeopardy raises a question of constitutional law." *Commonwealth v. Wood,* 803 A.2d 217, 220 (Pa.Super.2002) (quoting *Commonwealth v. Mattis* [454 Pa.Super. 605], 686

---

**2.** Appellee filed a motion to quash on July 8, 2009, claiming the Commonwealth's notice of appeal was untimely. Appellee renewed the matter in his brief on reargument. Nevertheless, the certified docket entries indicate the

Commonwealth timely filed its notice of appeal on March 3, 2009. To the extent that motion is deemed open, we deny it and refuse to quash the appeal.

A.2d 408, 410 (Pa.Super.1996)[, *appeal denied*, 547 Pa. 752, 692 A.2d 564 (1997) ] ). "This court's scope of review in making a determination on a question of law is, as always, plenary." *Wood, supra* at 220 (quoting *Mattis, supra* at 410). "As with all questions of law, the appellate standard of review is *de novo....*" *Commonwealth v. Kositi*, 880 A.2d 648, 652 (Pa.Super.2005) (quoting *In re Wilson*, 879 A.2d 199, 214 (Pa.Super.2005) (*en banc* )).

*Commonwealth v. Vargas*, 947 A.2d 777, 780 (Pa.Super.2008). Appellate review of the trial court's findings of fact in a double jeopardy matter further implicates the following:

> Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

*Wood, supra* (internal citations omitted).

> In certain circumstances, prosecutorial misconduct may rise to a level of overreaching and result in a mistrial, in which case double jeopardy will bar [retrial] of the defendant. The rationale that supports the proscription embodied in the double jeopardy clause is that
>
> > the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.
>
> A criminal proceeding imposes heavy pressures and burdens psychological, physical, and financial on a person charged. The purpose of the Double Jeopardy Clause is to require that he be subject to the experience only once for the same [offense].
>
> Whereas innocent prosecutorial error cannot always be avoided, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against. Under Pennsylvania law, there are two types of prosecutorial misconduct that trigger double jeopardy. First, the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. Second, retrial is also prohibited when the prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial.

*Id.* at 220–21 (internal citations and quotation marks omitted).

■ On appeal, the Commonwealth asserts double jeopardy principles do not apply to prosecutorial misconduct occurring after remand for a new trial, but before the retrial actually occurs. Moreover, the Commonwealth contends the record does not support the trial court's finding that the prosecutor acted intentionally to prejudice Appellee's right to a fair trial. The Commonwealth argues there is no competent evidence that the prosecutor had a "secret meeting" with J.L. prior to the competency hearing. The Commonwealth also emphasizes that this alleged act of misconduct has nothing to do with the actions of the prosecutor during trial, which is where the misconduct must occur for double jeopardy to bar a retrial. Re-

garding the prosecutor's failure to produce capacity assessments and a witness list, the Commonwealth maintains that mere technical violations of the criminal discovery rules do not amount to the intentional deprivation of Appellee's right to a fair trial. The Commonwealth concludes the prosecutor's actions did not rise to the level of misconduct sufficient to bar retrial under the double jeopardy clause of the Pennsylvania Constitution, and this Court must reverse the order granting Appellee's motion to dismiss.[3] We disagree.

■ Prior to *Smith, supra,* our Supreme Court held that double jeopardy will attach only to those mistrials intentionally caused by overt prosecutorial misconduct. *See Commonwealth v. Simons,* 514 Pa. 10, 16, 522 A.2d 537, 540 (1987). In *Smith,* however, our Supreme Court recognized the need to expand this standard to address situations where the Commonwealth concealed its efforts to subvert the truth-determining process:

> We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, **but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.** Because the prosecutor's conduct in this case was intended to prejudice the defendant and thereby deny him a fair trial, [the defendant] must be discharged on the grounds that his double jeopardy rights, as guaranteed by the Pennsylvania Constitution, would be violated by conducting a second trial.

*Smith, supra* at 186, 615 A.2d at 325 (emphasis added).

■ The Supreme Court elaborated on this standard in *Commonwealth v. Martorano,* 559 Pa. 533, 741 A.2d 1221 (1999), announcing that the prosecutorial misconduct required to trigger double jeopardy protections need not be identical to the intentional concealment of exculpatory evidence at issue in *Smith:*

> Although it may have been the particular circumstances of the *Smith* case that prompted the Court to re-evaluate its decision in *Simons,* there is no doubt that **the Court intended the *Smith* rule to be one of general application.**

* * *

Furthermore, we find no language in *Smith* to indicate that concealment of evidence is the only type of prosecutorial misconduct that may be intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. To the contrary, **the holding of *Smith* ap-**

---

**3.** The Commonwealth also insists the trial court reopened a double jeopardy claim that the courts had already resolved against Appellee. The Commonwealth cites this Court's decision in *Anderson I* for the proposition that its actions at the September 2001 trial did not rise to the level of misconduct that would bar Appellee's retrial on double jeopardy grounds. As Appellee has already litigated a double jeopardy issue, the Commonwealth asserts the law of the case doctrine precludes Appellee from relitigating the instant double jeopardy claim. We note, however, the law of the case doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *Commonwealth v. Starr,* 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995). Here, Appellee's double jeopardy claim concerns an ongoing pattern of prosecutorial misconduct, much of it occurring **after** this Court's decision in *Anderson I.* Thus, the courts had not considered these latest instances of prosecutorial misconduct, and the law of the case doctrine does not preclude Appellee from raising his current double jeopardy claim.

**pears to be deliberately nonspecific, allowing for any number of scenarios in which prosecutorial overreaching is designed to harass the defendant through successive prosecutions or otherwise deprive him of his constitutional rights.**

*Martorano, supra* at 538, 741 A.2d at 1223 (emphasis added) (internal quotation marks omitted). Thereafter, our Supreme Court evaluated the prosecutor's actions in *Martorano,* which included references to evidence that the trial court had ruled inadmissible, continual defiance of the court's rulings on objections, and repeated insistence that there was fingerprint evidence linking the defendants to the crime when the prosecutor knew such evidence did not exist. Our Supreme Court concluded:

> While such misconduct does not involve concealment of evidence as in *Smith,* it nonetheless evinces the prosecutor's intent to deprive [the defendants] of a fair trial; to ignore the bounds of legitimate advocacy; in short, to win a conviction by any means necessary. This is precisely the kind of prosecutorial overreaching to which double jeopardy protection applies.

*Id.* at 539, 741 A.2d at 1223. For purposes of double jeopardy, neither *Martorano* nor *Smith* limits the prosecutorial misconduct in question to misconduct that occurs before or during the first trial.

■ Instantly, the Commonwealth charged Appellee with multiple sex offenses perpetrated against three different victims. Following his first trial, the jury found Appellee guilty of indecent assault as to D.M., but the jury could not reach a verdict on the charges related to T.C. and J.L. Following a retrial, the jury found Appellee guilty of indecent assault as to T.C. and IDSI and indecent assault as to J.L. On appeal, this Court reversed the conviction and discharged Appellee as to the indecent assault of D.M. This Court also vacated and remanded for a new trial on the charges involving J.L. and T.C., concluding the prosecutor's misconduct had unduly prejudiced the jury.

Upon remand, the court found T.C. and J.L. were incompetent to testify at the new trial. The Commonwealth timely filed a notice of appeal, and this Court reversed and remanded the case for trial. Upon remand, Appellee requested another competency hearing, accusing the prosecutor of "coaching" the witnesses during the prior proceedings. The trial court granted Appellee's request, issuing its October 29, 2007 order to address concerns about the possibility of taint. Specifically, that order prohibited the prosecutor from meeting with the witnesses unless Polk Center personnel were present. The court also ordered the prosecutor to keep a log of his visits with the witnesses, to deliver certain mental capacity assessments, and to produce a witness list.

At the June 6, 2008 competency hearing, defense counsel immediately informed the court that the prosecutor had not provided a log of his meetings with J.L. The prosecutor responded that he had met with J.L. only once, and the meeting occurred earlier that afternoon: "Today, yeah, today's the only time." (*See* N.T. Competency Hearing, 6/6/08, at 5.) The prosecutor denied discussing any matters related to the hearing with J.L. and indicated that J.L.'s day program supervisor was present at the meeting. When defense counsel pressed the prosecutor for additional details, the prosecutor admitted he had spoken with J.L. while delivering a subpoena during the prior week. The prosecutor, however, denied having any conversation with J.L. about the case: "Not about this case, just about—I handed him the subpoena, [J.L.]

was there, saying how ya doing, give the subpoena and then left." (*Id.* at 8).

At that point, the prosecutor began direct examination of J.L. The prosecutor asked several questions about professional sports teams to demonstrate the witness' ability to perceive events accurately, communicate on the witness stand, and distinguish between truth and falsehood:

[PROSECUTOR]: Now, what's your favorite sport?

[WITNESS]: Penguins.

[PROSECUTOR]: Okay, what sport do they play?

[WITNESS]: Hockey.

[PROSECUTOR]: Did you see the Penguins play?

[WITNESS]: I saw them play.

[PROSECUTOR]: Okay, when was that?

[WITNESS]: Wednesday night.

[PROSECUTOR]: Okay, and did they win or they lose?

[WITNESS]: They lost.

[PROSECUTOR]: Do you like football too?

[WITNESS]: I love football.

[PROSECUTOR]: What's your favorite team?

[WITNESS]: Steelers.

[PROSECUTOR]: Favorite player?

[WITNESS]: Ben Roethlisberger.

[PROSECUTOR]: Who's he?

[WITNESS]: The quarterback.

[PROSECUTOR]: He's the quarterback?

[WITNESS]: (Nods head affirmatively.)

[PROSECUTOR]: Okay, do you know any other players on the Steelers?

[WITNESS]: Willie Parker.

[PROSECUTOR]: What position does he play?

[WITNESS]: Running back.

[PROSECUTOR]: Okay, anyone else?

[WITNESS]: Hines Ward, wide receiver.

[PROSECUTOR]: Okay, and what team do they play for?

[WITNESS]: Pittsburgh.

[PROSECUTOR]: Okay, and what's the name of the Pittsburgh team?

[WITNESS]: Steelers.

[PROSECUTOR]: Now [J.L.], I need to ask you these questions. If someone were to say that Willie Parker plays for the New England Patriots, is that the truth or is that a lie?

[WITNESS]: That's a lie.

[PROSECUTOR]: Okay. And if someone were to say that Hines Ward plays for the Seattle Seahawks, is that the truth or is that a lie?

[WITNESS]: That's a lie.

(*Id.* at 11–12).

On cross-examination, J.L. confirmed he had met with the prosecutor earlier that afternoon. Defense counsel asked J.L. about this meeting:

[COUNSEL]: Did he tell you what the answer to the sports questions were?

[WITNESS]: Yes.

[COUNSEL]: Did he go over these specific questions he was going to ask you?

[WITNESS]: Yes.

[COUNSEL]: Did he tell you what the answers should be?

[WITNESS]: Yes.

(*Id.* at 18–19). Defense counsel also asked J.L. about the meeting the week before, when the prosecutor delivered the subpoena:

[COUNSEL]: [The prosecutor] just said he met with you in the last hour right?

[WITNESS]: Here.

[COUNSEL]: Yeah, right. [The prosecutor] also said he met with you last week, do you remember that?

[WITNESS]: Saturday.

[COUNSEL]: Okay, and what happened on Saturday?

[WITNESS]: We talked about sports.

[COUNSEL]: Did you talk about sports on Saturday?

[WITNESS]: M-hm, we was watching the Penguin game together.

[COUNSEL]: Okay, how long did you watch the Penguin game together?

[WITNESS]: Till it was over.

[COUNSEL]: How long was that, the whole game?

[WITNESS]: Yeah, the whole game.

[COUNSEL]: Did you talk about sports?

[WITNESS]: M-hm.

(*Id.* at 31).

Addressing the prosecutor, the court said:

[Y]ou served the subpoena yourself personally in this case and during that period of time it was testified then you were there and watched hockey with [J.L.] and you talked about sports and that was his testimony. Now, I'll tell you why I was a little uncomfortable with that at that point in time. Even though you've asserted ... that you weren't talking to him about competency. You had a conversation with him about sports and you were watching the hockey game when the majority of what the testimony was or the questions asked of that witness to establish competency today was sports and he indicated you watched the Penguins and questions were asked about the Penguins game ... and those recollections.

(*Id.* at 140–41). The court found that the prosecutor had met with J.L. the week before to rehearse the sports-related questions and answers for the competency hearing while watching the Pittsburgh Penguins hockey game. Without denying the proposed taint, the prosecutor responded, "We can bring him down and ask him different questions." (*Id.* at 141).

At the conclusion of the hearing, defense counsel argued the prosecutor had failed to comply with the October 29, 2007 order. Defense counsel indicated the prosecutor did not provide mental capacity assessments or a witness list, and failed to maintain a log of his meetings with J.L. After a brief recess, the court acknowledged the prosecutor's violations and expressed concern over the tainted testimony. The court continued the matter until July 31, 2008 "to guarantee that the competency hearing is conducted with no question of taint or question of the competency of the witnesses to testify at that time...." (*Id.* at 144).

Before the new competency hearing, Appellee filed his motion to dismiss on double jeopardy grounds. At the July 31, 2008 hearing, the court heard argument on Appellee's motion to dismiss. The prosecutor continued to deny he had met with J.L. in violation of the October 29, 2007 order:

Your Honor again ... there was no contact and that's where [defense counsel is] misleading the court again. The contact was that day [of the competency hearing], Your Honor. I could not prepare a log when the first time I met with [J.L.] was that day. That's where [defense counsel is] misleading the court.

(*See* N.T. Hearing, 7/31/08, at 85.) The prosecutor reiterated he had no other contact with J.L. concerning the competency hearing. (*Id.*) Essentially, the prosecutor asked the court to deem J.L. competent to testify at the retrial, but to disregard as incredible J.L.'s testimony about the other meeting with the prosecutor.

On this record, the trial court found the prosecutor's actions constituted an overall pattern of misconduct designed to violate Appellee's right to a fair trial:

> The [c]ourt finds that [the prosecutor] met with J.L. on Saturday, May 31, 2008, six days before the June 6, 2008 Competency Hearing without a third party present, in brazen violation of the [October 29, 2007] Order. The [c]ourt finds that during this improper meeting, which lasted for hours, [the prosecutor] told J.L. the questions he was going to be asked at the competency hearing, as well as the answers. The [c]ourt finds that at the June 6, 2008 Competency Hearing, [the prosecutor] did ask those same questions to J.L., eliciting the predetermined responses. The [c]ourt finds that [the prosecutor] lied . . . about the existence of the meeting, as well as what happened at the meeting. The [c]ourt finds that [the prosecutor] intended that his taint of the witness J.L. would never be discovered. The [c]ourt finds [the prosecutor's] dishonesty in this matter to be appalling. The [c]ourt finds that [the prosecutor] did not make any attempt to provide defense counsel with a list of witnesses as mandated in the October 29, 2007 Court Order. The [c]ourt finds that [the prosecutor] did not make any attempt to provide the defense with mental capacity assessments performed after January 2004 as mandated by the October 29, 2007 Court Order.
>
> The [c]ourt finds that at the July 31, 2008 Motion to Dismiss Hearing, [the prosecutor] continued to perpetrate his fraud on [the court] and [Appellee].

(*See* Trial Court Opinion at 52–53.)

Additionally, the court considered the cumulative effect of all the prosecutorial misconduct that had plagued the case:

> The [c]ourt recognizes that [the prosecutor] committed prosecutorial misconduct at the second trial against [Appellee], who was being prosecuted for alleged criminal acts perpetrated against J.L. and T.C. The [c]ourt recognizes that [Appellee] is currently being prosecuted for the same alleged criminal acts perpetrated against J.L. and T.C. The [c]ourt finds that [the prosecutor] has again committed prosecutorial misconduct. The [c]ourt finds that [the prosecutor's] misconduct is especially egregious due to its cumulative effect. The [c]ourt finds that both the prior misconduct and the current misconduct are properly before this [c]ourt because [Appellee] has not waived his double jeopardy protection and is now being retried, after remand due to prosecutorial misconduct, for the same alleged criminal conduct.
>
> The [c]ourt finds that [the prosecutor's] ongoing and egregious misconduct offends the principles articulated by our Supreme Court in *Smith* and *Martorano*. The [c]ourt finds that [the prosecutor's] out-of-court subversive tactics are particularly heinous as they fall within the scenario described in [*Commonwealth v. Rightley*, 421 Pa.Super. 270, 617 A.2d 1289, 1293 n. 3 (1992)], ". . . subversive tactics are oftentimes more heinous than conduct which occurs in defendant's presence in the courtroom, simply because the injustice done to defendant may never surface." We further find that in regard to the prosecution of [Appellee] for crimes allegedly committed against J.L. and T.C., (1) [the prosecutor] intended to subvert the truth-seeking process, (2) [the prosecutor] intended to forever conceal his misconduct in order to win a conviction at any cost, and (3) [the prosecutor's] misconduct was intended to violate [Appellee's] right to a fair trial.

(*Id.* at 53–54). The record supports the court's findings.[4] *See Wood, supra.*

Here, the prosecutor did more than demonstrate a flagrant disregard for a pretrial discovery order.[5] The prosecutor engaged in a pattern of pervasive misconduct throughout the proceedings, culminating in the improper meeting with J.L. Despite J.L.'s testimony that the meeting had occurred and the parties rehearsed certain questions and answers, the prosecutor continued to deny any wrongdoing. The prosecutor's disingenuous responses served only to exacerbate the misconduct. Under these circumstances, the prosecutor intentionally acted to prejudice the defendant to the point of the denial of a fair trial. *See Smith, supra.* The *Smith* standard is broad enough to cover the prosecutorial overreaching that occurred in this case. *See Martorano, supra.* As such, we conclude double jeopardy principles apply to prosecutorial misconduct that occurs after remand for a new trial but before the retrial. On this record, the court properly determined double jeopardy barred Appellee's retrial. *See Wood, supra.*

Based upon the foregoing, we hold prosecutorial misconduct occurring after remand for a new trial but before the retrial can serve to warrant dismissal of charges under the double jeopardy clause of the Pennsylvania Constitution. We further hold the trial court properly granted Appellee's motion to dismiss, because the prosecutor committed intentional misconduct to deny Appellee a fair retrial. Ac-cordingly, we affirm the trial court's order granting Appellee's motion to dismiss.

Order affirmed.

*Judge OLSON files a dissenting opinion in which President Judge STEVENS, President Judge Emeritus FORD ELLIOTT and Judge DONOHUE join.

## DISSENTING OPINION BY OLSON, J.:

I respectfully dissent from the learned Majority's holding that prosecutorial misconduct occurring after remand for a new trial but before the new trial can serve to bar the new trial under the double jeopardy clause of the Pennsylvania Constitution. *See* Majority at 840. I believe that in adopting this holding the Majority improperly broadens the scope of Pennsylvania's double jeopardy clause beyond that which was intended by our Supreme Court in *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992) and *Commonwealth v. Martorano*, 559 Pa. 533, 741 A.2d 1221 (1999). Consequently, I would reverse the trial court's order granting Appellee's motion to dismiss on the basis of double jeopardy, and would remand the case for the trial court's imposition of a legally permitted sanction, given the prosecutor's blatant misconduct in this case.

Indeed, I agree with my colleagues that the prosecutor's actions in this matter amounted to a flagrant disregard for the trial court's October 29, 2007 pretrial order, resulting in inexcusable misconduct,

---

4. In *Anderson I*, this Court previously put the same prosecutor on notice to temper his "zealous and spirited" advocacy, warning him that he had already crossed boundaries to create an unsavory aura about the trial, including lewd conduct in open court. The prosecutor's actions on remand were more clandestine but no less offensive, in light of this Court's prior admonition.

5. Ordinarily, the dismissal of charges is "a penalty far too drastic" for a prosecutor's violation of discovery rules. *Commonwealth v. Gordon*, 364 Pa.Super. 521, 528 A.2d 631, 641 (1987), *appeal denied*, 517 Pa. 621, 538 A.2d 875 (1988).

worthy of sanction and even disciplinary proceedings. The prosecutor's actions have burdened Appellee, the victims, our courts, and the public with protracted legal proceedings. However, despite my belief that the prosecutor's actions in this matter were inexcusable, I do not believe that dismissal of the charges based upon double jeopardy is legally correct. I believe that the double jeopardy principles set forth in *Smith* and *Martorano* are limited to instances of prosecutorial misconduct affecting the fairness of a trial—not to instances where the misconduct occurs and is discovered before trial such that the unfairness, however appalling, can be remedied. Application of fundamental principles of double jeopardy, such as when jeopardy attaches, further support my conclusion. Consequently, after a thorough review of the history and doctrines of Pennsylvania's double jeopardy protection, I am constrained to dissent.

Specifically, Appellee bases his motion for dismissal of the prosecution upon Pennsylvania's double jeopardy clause, Article 1, Section 10 of the Pennsylvania Constitution.[1] The double jeopardy clause contained in the Pennsylvania Constitution is slightly broader than its federal counterpart.[2] As our Supreme Court explained in *Martorano*:

> Prior to the United States Supreme Court's decision in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), [the Supreme Court of Pennsylvania] followed federal law in recognizing two types of prosecutorial misconduct that would implicate double jeopardy principles:
>
> First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. [*Citing United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) ]. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. [*Citing Lee v. United States,* 432 U.S. 23, 32, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977); *Dinitz,* 424 U.S. at 611, 96 S.Ct. 1075]. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

*Commonwealth v. Starks,* 490 Pa. 336, 416 A.2d 498, 500 (1980). In *Kennedy,* though, the United States Supreme Court appeared to limit the scope of federal double jeopardy protection, holding that, "the circumstances under which . . . a defendant [who has successfully moved for a mistrial] may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Kennedy,* 456 U.S. at 679, 102 S.Ct. 2083.

[The Supreme Court of Pennsylvania] initially followed the new *Kennedy* standard, declaring in *Commonwealth v. Simons,* 514 Pa. 10, 522 A.2d 537, 540 (1987), that, "henceforth double jeopardy will attach only to those mistrials which have been intentionally caused by prose-

---

1. Pursuant to Article 1, Section 10 of the Pennsylvania Constitution, "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb."

2. The Fifth Amendment of the United States Constitution states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . ."

cutorial misconduct." The [Pennsylvania Supreme] Court in *Simons*, however, expressly acknowledged [the Pennsylvania] Court's ability to "establish greater protection for our state citizens than provided by the United States Supreme Court." *Id*. Five years later in *Smith*, the [Pennsylvania Supreme] Court did just that.

*Martorano*, 741 A.2d at 1222 (parallel citations omitted).

In *Smith*, the defendant was convicted of first-degree murder and sentenced to death, but on direct appeal the Pennsylvania Supreme Court reversed and remanded for a new trial due to the erroneous admission of hearsay testimony. *Smith*, 615 A.2d at 321–322. However, prior to retrial, the defendant filed a motion to dismiss, alleging double jeopardy because of prosecutorial misconduct. *Id*. at 322.

The misconduct in *Smith* has been summarized as follows:

> [In *Smith*, the] Commonwealth deliberately withheld . . .: (1) the existence of an agreement with its chief witness pursuant to which he received lenient treatment at sentencing on unrelated charges in exchange for his testimony, and (2) material, exculpatory physical evidence that it had discovered mid-trial. The physical evidence consisted of grains of sand that were found between the toes of the murder victim at her autopsy. The sand was consistent with . . . the defense that the crime had been committed in Cape May, New Jersey, by others, and not by [the defendant] in Pennsylvania, as the Commonwealth had alleged. At trial, when a Pennsylvania state trooper testified on cross-examination that granular particles which looked like sand had been removed from the victim's body, the Commonwealth implied that he had fabricated his testimony and the trial prosecutor recommended to his superior that he investigate the feasibility of prosecuting the state trooper for perjury. **While the trial was still in progress,** the state police discovered the adhesive "lifters" that had been used to remove and retain the sand from the victim's feet. The Commonwealth, however, failed to disclose this evidence and, indeed, continued to suppress the evidence for over two years while the case was on direct appeal to [the Supreme Court].

*Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1144–1145 (2001) (internal citations omitted) (emphasis added).

In *Smith*, both the trial court and our Court held that intentional prosecutorial misconduct had been proven, but deferred the remedy, an issue of first impression, to the Supreme Court. *Smith*, 615 A.2d at 322. The Supreme Court, while acknowledging that the defendant would not be entitled to relief under federal double jeopardy jurisprudence, considered whether the Pennsylvania double jeopardy clause bars retrial following intentional prosecutorial misconduct designed to secure a conviction through the concealment of exculpatory evidence. *Smith*, 615 A.2d at 322. Emphasizing the egregious nature of the misconduct in that case and its resulting unfairness (culminating in a death sentence), the Supreme Court held that:

> the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant and thereby deny him a fair trial.

*Id*. at 325. The Supreme Court stated that, "[b]ecause the prosecutor's conduct in this case was intended to prejudice the defense and thereby deny him a fair trial,

[the defendant] must be discharged on the grounds that his double jeopardy rights, as guaranteed by the Pennsylvania Constitution, would be violated by conducting a second hearing." *Id.*

Seven years later, the Pennsylvania Supreme Court decided *Martorano*. In that case, the prosecutor committed misconduct during trial including, "blatantly disregarding the trial court's evidentiary rulings, disparaging the integrity of the trial court in front of the jury, and repeatedly alluding to evidence that the prosecutor knew did not exist." *Martorano*, 741 A.2d at 1222. While acknowledging the misconduct, the Commonwealth attempted to argue that double jeopardy principles were not proper because *Smith* applied only to cases where the prosecution withheld exculpatory evidence. *Id.* The Supreme Court rejected that argument, holding that double jeopardy barred retrial where the prosecutor's action "evinces the prosecutor's intent to deprive [the defendant] of a fair trial; to ignore the bounds of legitimate advocacy; in short, to win a conviction by any means necessary." *Id.* at 1223.

Significant in *Smith* was the fact that the prosecutors' actions involved multiple acts of misconduct and deceit, **all of which occurred during trial,** but none of which was discovered until **after** trial. Moreover, in *Martorano*, the prosecutor's misconduct occurred **during** trial. Consequently, the defendants in both of those cases were prejudiced "to the point of denial of a fair trial." *Smith*, 615 A.2d at 325; *Martorano*, 741 A.2d at 1223 ("While such misconduct does not involve concealment of evidence as in *Smith*, it nonethe-

less evinces the prosecutor's intent to deprive [the defendant] of a fair trial.") By contrast, in this matter the prosecutorial misconduct occurred **after** the remand for a new trial and was discovered **prior** to the start of the new trial. Thus, the misconduct currently at issue did not affect a prior trial, and, because of its discovery, did not necessarily preclude a fair new trial.

Although the Majority stresses the cumulative effects of the multiple instances of prosecutorial misconduct throughout the protracted life of this case (*see* Majority at 22–23), the misconduct at issue in Appellee's motion was necessarily limited to the prosecutor's disregard for the trial court's October 29, 2007 order. There is no question that there were earlier acts of misconduct, but those earlier acts were already addressed by our Court in *Commonwealth v. Anderson*, 855 A.2d 127 (Pa.Super.2004) (unpublished memorandum) at 14–15 ("*Anderson I*"), wherein we held that the misconduct did "not rise to the level of the intentional prejudice of the prosecutor in *Smith.*" Consequently, in *Anderson I* we reversed and remanded the matter for a new trial, at the request of Appellee, but declined to dismiss the charges based upon double jeopardy.[3]

It was upon preparing for the new trial that the instant occurrences of misconduct took place and were discovered. That the misconduct at issue here took place and was discovered pretrial is significant—Appellee was not subjected to an unfair trial as his new trial had yet to occur. Therefore, the double jeopardy principles set forth in *Smith* and *Martorano* are inappli-

---

**3.** Indeed, *Smith* does not "create a *per se* bar to retrial in all cases of intentional prosecutorial misconduct." *Commonwealth v. Rightley*, 421 Pa.Super. 270, 617 A.2d 1289, 1293–1294 (1992); *see Commonwealth v. Manchas*, 430 Pa.Super. 63, 633 A.2d 618 (1993) (late dis-

closure of a Commonwealth witness by the district attorney did not require dismissal of a prosecution pursuant to *Smith* where defense counsel was informed of the witness, interviewed him, and investigated him prior to the start of trial).

cable. The fairness of Appellee's prior trial was not affected by the prosecutor's violation of the trial court's October 2007 pretrial order. More importantly, Appellee was not subjected to an unfair retrial since the misconduct was discovered before the new trial and, therefore, could be remedied through the imposition of sanctions.[4]

Moreover, when this Court remands a criminal matter for a new trial, the defendant should be placed in the same shoes in which he stood prior to the original trial. In other words, the options, including appropriate sanctions, available to the trial court when pretrial prosecutorial misconduct occurs should be the same regardless of whether the misconduct occurs and is discovered before the original trial or a subsequent trial following remand. Fundamental principles of double jeopardy support this conclusion.

We have previously held that whether double jeopardy is being considered as a remedy for prosecutorial misconduct or other reasons, "**when** jeopardy attaches in a trial 'serves as the lynchpin for all double

jeopardy jurisprudence.'" *Commonwealth v. Carson*, 259 Pa.Super. 183, 393 A.2d 778, 782 (1978) (*en banc*) (emphasis added). No matter the equities or injustices presented:

> the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial.... Implicit in the latter policies is the premise that the constitutional policies underpinning the [double jeopardy] guarantee are not implicated before that point in the proceedings at which jeopardy attaches.... This by no means is a mere technicality, nor is it a rigid mechanical rule. It is, of course, like most legal rules, an attempt to impart content to an abstraction.

*Serfass v. United States*, 420 U.S. 377, 391, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975) (internal citations and quotations omitted).

The rule that jeopardy does not attach until the commencement of trial was established because "at the heart of double jeopardy jurisprudence is the requirement that an individual demonstrate ... he ...

---

4. It must be noted that, as a result of our remand order in *Anderson I*, Appellee faced a retrial even if the misconduct at issue had not occurred. Thus, the only potential prejudice that Appellee faced because of the prosecutor's actions was that testimony might have been given by a tainted witness at the retrial. An order barring J.L. from testifying would ameliorate any such prejudice. I believe that this disposition complies with the precedent established by our Supreme Court, which has consistently described the dismissal of charges as an extreme remedy that should be imposed sparingly. *See Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1144 (2001). I recognize that our Supreme Court has authorized dismissal as a sanction where blatant prosecutorial overreaching was intended either to provoke a defendant into a mistrial or to deprive the defendant of a fair trial. *See Smith, supra*. I also acknowledge that our Supreme Court has generally deemed the remedy of dismissal to be too severe of a sanction in cases where the con-

duct of the prosecutor constituted a violation of the rules pertaining to discovery. *See, e.g., Burke*, 781 A.2d at 1145–1146 (collecting and reviewing cases). The present case presents a somewhat hybrid situation. Here, we are confronted with a blatant form of prosecutorial misconduct which clearly exceeded a mere violation of the pretrial discovery rules but which, due to its discovery prior to Appellee's retrial, did not implicate double jeopardy protections. Under these circumstances, any potential unfairness flowing from the prosecutor's misdeeds can be addressed and remedied prior to retrial. Thus, I believe that discharge constitutes too harsh a sanction and that an exclusionary order serves as a more appropriate remedy. *See Commonwealth v. Shaffer*, 551 Pa. 622, 712 A.2d 749, 752 (1998) (extreme remedy of dismissal should be considered sparingly and only where the actions of the Commonwealth are both egregious and will cause the defendant to suffer demonstrable prejudice if the case against him proceeds).

has been subjected to the risk of a trial on the merits." *Commonwealth v. Hunter,* 449 Pa.Super. 493, 674 A.2d 306, 307 (1996), *appeal dismissed as improvidently granted,* 549 Pa. 571, 701 A.2d 1356 (1997). Therefore,

> "[i]n Pennsylvania, jeopardy does not attach and the constitutional prohibition against double jeopardy has no application until a defendant stands before a tribunal where guilt or innocence will be determined." *Id.* "In a criminal jury trial, **jeopardy attaches when the jury is sworn.** In a bench trial, however, jeopardy attaches when the trial court begins to hear the evidence." *Commonwealth v. Micklos,* 448 Pa.Super. 560, 672 A.2d 796, 799 (1996), *appeal denied,* 546 Pa. 678, 686 A.2d 1309 (1996) (internal citation omitted).

*Commonwealth v. Vargas,* 947 A.2d 777, 780–781 (Pa.Super.2008) (parallel citations omitted) (emphasis added); *Carson,* 393 A.2d at 782 ("We cannot hold that this rule [regarding when jeopardy attaches], so grounded, is only at the periphery of double jeopardy concerns.")

Consequently, multiple Pennsylvania decisions have determined that double jeopardy principles do not apply at the pretrial stage. For example, in *Commonwealth v. Smith,* 232 Pa.Super. 546, 334 A.2d 741, 742 (1975) (*en banc*), our Court held that the defendants were not subjected to double jeopardy when they were bound over for trial on accessory charges, after initial charges of receiving stolen property were dismissed. As our Court explained,

> [a] preliminary hearing in our Commonwealth is not a trial and its purpose is not to decide guilt or innocence; but rather to determine whether a prima facie case has been made out which is legally sufficient to hold the accused for the grand jury.... Moreover, it is axiomatic that in order to prevail on a plea

of double jeopardy the defendant must establish that he has already been placed in jeopardy.

*Id.; see also Commonwealth v. Ortega,* 995 A.2d 879, 887 (Pa.Super.2010) (*citing Vargas* as to when jeopardy applies and holding that testimony regarding an arrest at a violation of probation hearing was not prohibited by double jeopardy, even though the charges were eventually dropped, because the charges "were dismissed preliminarily, before a jury was empanelled or a trial court sitting as finder of fact began to hear evidence.")

Here, it is clear that the misconduct at issue did not occur until the "pretrial" phase since the misconduct occurred after the remand for a new trial and before the jury for the new trial was impaneled. Once the matter was remanded for a new trial, it was as if the prior trials never occurred—the slate, in essence, was wiped clean. *See, e.g., U.S. v. Tobin,* 552 F.3d 29, 32 (1st Cir.2009) ("[J]eopardy had attached when the original jury was impaneled but the remand had wiped the slate clean.") Therefore, despite the unfortunate protracted history of this matter, at the time that the misconduct at issue took place and was discovered, it was **before** the jury for the new trial was sworn. Pretrial prosecutorial misconduct of the type which occurred in this case must be treated as if it occurred before the initial trial. Since traditional sanctions are available to the trial court, pretrial prosecutorial misconduct should not assume special significance merely because it occurred before retrial following remand.

Consequently, I respectfully disagree with the Majority's holding that "double jeopardy principles apply to prosecutorial misconduct that occurs after remand for a new trial but before retrial". Majority at 840. Though the holdings in *Smith* and *Martorano* expanded double jeopardy

principles to apply in broader instances of prosecutorial misconduct, neither holding contemplated expanding the scope to instances where a prior trial was not affected, or to pretrial proceedings following remand. Therefore, I believe that the Majority's holding in this matter inappropriately broadens the scope of double jeopardy in this Commonwealth.

Moreover, although the prosecutor's actions in this matter are nothing short of appalling, if Appellee can be given a fair trial I believe that the public is entitled to that trial. As our Supreme Court explained in *Burke:*

> Because of the compelling societal interest in prosecuting criminal defendants to conclusion, this Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and, relevant to the question here, only in cases of blatant prosecutorial misconduct. As … Justice Cappy, in his Opinion Announcing the Judgment of the Court in *Commonwealth v. Shaffer,* 551 Pa. 622, 712 A.2d 749, 752 (1998), explained:
>
>> Dismissal of criminal charges punishes not only the prosecutor … but also the public at large, since the public has a reasonable expectation that those who have been charged with crimes will be fairly prosecuted to the fullest extent of the law. Thus, the sanction of dismissal of criminal charges should be utilized only in the most blatant cases. Given the public policy goal of protecting the public from criminal conduct, a trial court should consider dismissal of charges where the actions of the Commonwealth are egregious and where demonstrable prejudice will be suffered by the defendant if the charges are not dismissed.

*Id.* at 752, see also *Commonwealth v. McElligott,* 495 Pa. 75, 432 A.2d 587, 589 (1981) ("The remedy of discharge without a fair and complete fact-finding procedure is extreme and will not be invoked absent deliberate bad faith prosecutorial misconduct"); *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321, 325 (1992) (dismissal of charges is appropriate only where "prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, [or where] the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial").

*Burke,* 781 A.2d at 1144 (parallel citations omitted).

As a result, I would reverse the trial court's order granting Appellee's motion to dismiss and would remand this matter to the trial court to consider an alternative means of sanction to address the misconduct in this case (such as an order barring J.L. from testifying), while balancing the public's interest in punishing criminal offenders.