J-S14025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                              :  PENNSYLVANIA
                              :
          v.                  :
                              :
                              :
COLIN WILLIAM ABBOTT  :
                              :
        Appellant        :  No. 857 WDA 2022

Appeal from the PCRA Order Entered June 30, 2022
In the Court of Common Pleas of Butler County Criminal Division at
No(s):  CP-10-CR-0001863-2011

BEFORE:   PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:        **FILED:  August 2, 2023**

Appellant, Colin William Abbott, appeals from the post-conviction court's order denying his first, timely petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.  Appellant presents seven issues on review, all of which relate to his claim that trial counsel ineffectively failed to seek dismissal of all charges due to alleged prosecutorial misconduct designed to undermine the attorney-client relationship.  We affirm.

**I.**

In June of 2011, Appellant murdered his father and stepmother, and attempted to incinerate their corpses.  The Commonwealth sought the death penalty, and the case was set for trial on March 18, 2013.  The Commonwealth eventually offered a plea of *nolo contendere* to two counts of criminal homicide

_____

[*] Retired Senior Judge assigned to the Superior Court.

in the third degree, with the caveat that the offer would expire prior to jury selection. On February 26, 2013, Appellant accepted. He waived a pre-sentence investigation and the parties agreed to have the sentence imposed the next day. He received an aggregate sentence of 35 to 80 years of incarceration.

On March 11, 2013, Appellant filed a *pro se* motion to withdraw his plea, claiming that it was not entered voluntarily, knowingly or intelligently, on the basis that he was originally told he had until March 1, 2013, to accept the deal but was forced by the trial court to make his decision on February 26, 2013. He also contended that the sentence date deprived him of the more lenient "fair and just" standard applicable to attempts to withdraw a plea prior to sentencing. *See Commonwealth v. Carrasquillo*, 115 A.3d 1284, 1292 (Pa. 2015). The trial court denied relief, finding that Appellant failed to satisfy the "manifest injustice" standard applicable to post-sentence motions to withdraw. *See Commonwealth v. Muhammad*, 794 A.2d 378, 383 (Pa. Super. 2002) ("The standard for withdrawal of a guilty plea after imposition of sentence is much higher; a showing of prejudice on the order of manifest injustice is required before withdrawal is properly justified.") (quotation marks and citation omitted).

Appellant appealed, and we affirmed. *Commonwealth v. Abbott*, No. 708 WDA 2013, unpublished memorandum (Pa. Super. filed Nov. 14, 2013). We agreed that Appellant failed to establish a manifest injustice. We added that Appellant's assertion of manifest injustice was further belied by evidence

presented at the hearing on the motion to withdraw. The Commonwealth had presented "nine recorded telephone calls made by Appellant from prison that the trial court accepted as an exhibit," wherein "Appellant and his mother discussed ways to garner publicity and to create judicial 'chaos' by filing the motion to withdraw his plea." *Id.* at *7-8.

## II.

Those and other recorded jail calls are significant to Appellant's PCRA petition. Appellant filed a *pro se* petition on May 27, 2014. Following protracted proceedings, an amended petition was filed on February 28, 2020. In short, the legal claim alleged that the prosecutor assigned to the case, Assistant District Attorney Ben Simon, committed misconduct by informing Appellant's attorney of disparaging comments Appellant made about his counsel during phone calls. Appellant alleges that this misconduct warranted dismissal of all charges had trial counsel filed a motion to dismiss. For ease of discussion, this memorandum will first set forth the testimony adduced at the evidentiary hearing.

Appellant gradually became dissatisfied with his privately-retained trial counsel, Attorney Wendy Williams, beginning with her missing a court hearing on a motion filed by the Commonwealth. N.T., 7/29/20, at 13, 16. Appellant was also unhappy that Attorney Williams sent clerical members of her legal staff to visit him in jail, and that she missed a meeting with police and the prosecution to review discovery material. Appellant learned of her absence from the meeting to discuss discovery material when Attorney Kevin Flaherty,

- 3 -

who was the Chief Public Defender of Butler County and was appointed by the court to serve as mitigation counsel, arrived to ask if Appellant had heard from Attorney Williams. When Appellant next spoke to Attorney Williams, she told him that the meeting date was tentative and had never been finalized. She told Appellant that ADA Simon was angry at her failure to show and had called her father in an attempt to find her. Appellant testified that "she thought it was very inappropriate" that ADA Simon would resort to calling her family member. *Id.* at 34.

Attorney Williams stated that she met with the Commonwealth several times to look at evidence and "the only meeting that I know that I missed" was "a meeting to pick discovery up from the district attorney's office" very early in the case. *Id.* at 114. "I did not come when [ADA] Simon felt the day and time had been appointed for me to appear. I thought it was casual." *Id.* at 115. She stated that ADA Simon "somehow dug my home phone number of my elderly father up from a ticket I had received from the Butler City Police about ten years prior." *Id.* Her father "was told that I had failed to appear for a meeting" and he panicked, thinking that the police said she was a missing person. Attorney Williams "was extremely angry" and she denied ever giving that phone number to ADA Simon. *Id.* at 116. ADA Simon "claimed that was the number I had given him," but she denied this, saying that she "hadn't lived at my father's home address in over thirty years" and "would have never given [him] that number[.]" *Id*. at 115, 116. ADA Simon, who was called by the Commonwealth as a witness, testified that the missed meeting was to

review discovery. When Attorney Williams failed to show, ADA Simon "used the phone numbers that she provided me." *Id.* at 197.

Appellant stated he was "kind of annoyed as well[;] … I pay you all this money[,] are you going to go there or not[?]" *Id.* at 35. Appellant was also upset that Attorney Williams filed a motion to permit Appellant's mother to visit the crime scene. "Again, I'm in disbelief. You want my mom to go to the residence where this incident took place as a, I guess her, investigator, here?" *Id.* Appellant's mother was not permitted to view the crime scene, but Attorney Williams was allowed to visit. According to Appellant, she asked Appellant to pay for a new videorecorder so she could record her visit. However, "[w]hen she went to the crime scene with this videorecorder that we bought, she never took it out of the box. She never charged the battery. The entire purchase of it and use of it was a complete waste of money." *Id.* at 47. Appellant spoke to his mother about this in "[n]ot very nice" language. *Id.* at 48. Appellant then learned in November of 2012 that Attorney Williams asked his mother for $500 for gas money. Appellant "went through the roof" and refused to pay. *Id.* at 49. Again, Appellant spoke about all of this on the phone to his mother.

The tenor of these comments was eventually conveyed to Attorney Williams. Appellant stated that on October 4, 2012, Attorney Williams visited the jail following another meeting to review discovery. "Apparently[,] when she got to the police station[,] … [ADA] Simon told her that my mother hated her, and he was referencing the motion filed to tour the crime scene. I vividly

remember her saying his words were[,] 'why are you going to bat for [his mother]? She hates you. You should hear the things they're saying about you over the prison phone.'" ***Id.*** at 40-41.

Appellant also made disparaging remarks about ADA Simon, prompted by a visit from Attorney Flaherty. Appellant stated that, sometime in early November, he called his girlfriend to discuss her attending a New York Yankees game. The next day, Attorney Flaherty visited and asked specific details about that conversation, warning him that the Commonwealth was "still listening" and to "be careful what you say." ***Id.*** at 53. Appellant, believing that ADA Simon was listening to Appellant's calls every evening, asked Attorney Flaherty, "is he gay? This man [is] obsessed with me[.]" ***Id.*** at 54. Attorney Flaherty said "No, he's not gay. He has a girlfriend and [he] explained where she worked." ***Id.*** Appellant then made a phone call to his mother, relating the details of ADA Simon's personal life and where his girlfriend worked. Attorney Flaherty returned to the jail a few days later, angry at Appellant for sharing that information on the phone. Appellant was also told by Attorney Flaherty that, during a Butler County Christmas party, another assistant district attorney told Attorney Flaherty to "stay away from [ADA Simon]. He's ticked off at you for sharing personal information with [Appellant]." ***Id.*** at 60.

As trial preparations continued through the end of 2012 and into early 2013, Appellant received the plea offer. He and both attorneys discussed it. Attorney Williams was "supportive of [his] position" to reject the plea, whereas Attorney Flaherty recommended he take it. ***Id.*** at 66. Attorney Flaherty

"ended up storming out of the room. I started criticizing his performance as an attorney." *Id.* That evening, Appellant again disparaged his attorneys in a conversation with his mother.

That phone call led to an urgent request by Attorney Williams. According to Appellant, "around February 13th, 14th, 2013, I had gotten a call down to the guard's desk[. H]e said your attorney needs you to call her right away." *Id.* at 67-68. Attorney Williams testified why she was desperate to contact Appellant:

> So, that would have been February of 2013[,] when we were moving towards trial, moving towards working out a plea, like a runaway train. Things were getting quite heated, and I received a call very late in the day from [ADA] Simon of an emergent nature insisting I come down to Butler, come up to Butler immediately that day, that evening. That … some recordings that were calls form the jail of [Appellant]'s … were so explosive and important that I had to hear them immediately.
>
> * * *
>
> I mean, I thought [Appellant] had confessed or said something in the calls with his mother. The way it was put to me[,] it would kind of blow the case out of the water and of a very emergent nature, and I was quite upset because I couldn't get down here so I called [Attorney Flaherty], and it was very late in the day. It was like four o'clock.
>
> * * *
>
> I told him he's got to get over there to [ADA Simon]'s office. I mean, it wasn't a thing where it was you'll send it to me and I will listen to it. That February eighth weekend … my whole job was to get ready for trial … and [ADA] Simon felt the need to call me to tell me to get down there to listen to the thing[,] I was quite concerned.

*Id.* at 126-27.

The timing of this event is significant, and Appellant, Attorney Williams, and Attorney Flaherty all testified that this incident occurred before the plea. Attorney Flaherty recalled that Attorney Williams asked him to visit ADA Simon's office to review phone calls. He did not remember the exact date, but he believed it was close to trial "because [Attorney Williams] was aggressively preparing for trial. She was afraid again that something might have been said on those tapes." *Id.* ADA Simon "did allow me to listen to the tapes, and I don't think he was present making comments or anything[, he] just allowed me to listen to them, and I was satisfied that there was nothing inculpatory or exculpatory [in] nature on those tapes." *Id.* He did not take a copy of the tapes and described the comments as Appellant "saying things about [Attorney Williams] and probably saying things about myself[,] … just the usual stuff you expect. Someone's on trial for their life[,] they get frustrated … with [their] representation." *Id.* at 176.

Returning to Attorney Williams' account, she spoke to Attorney Flaherty that evening, explaining that he "was quite angry. … The nature of the recordings were basically [Appellant] and his mother talking about me, my child, my personal life, whatever, and [Attorney Flaherty]…. Not of evidentiary or case-related nature other than just derogatory, you know, inflammatory type comments, but it had no, there was no confession which is what I had feared." *Id.* at 128. Her "impression was [ADA] Simon wanted me to listen to the calls. [Attorney Flaherty] kind of stood in between that and said you're not going to listen them[,] you don't need to listen to them." *Id.* at 136. In

the interest of having a complete file, she requested a copy of the calls from Attorney Flaherty after her withdrawal from the case. Attorney Flaherty "said 'I don't have it and you're not getting it.'" *Id.* at 137 (quotation marks added). She "wasn't willing to fight him on it. I thought he had thrown it out or destroyed it, and he said he never actually physically got it from [ADA] Simon." *Id.* In general, Attorney Williams "felt [ADA] Simon was trying to push the case to trial and get in between my relationship with [Appellant] to do that and … obviously in a death penalty case[,] my job is to keep him from being on death row." *Id.* at 139. She testified that she was provided several sets of phone calls during discovery but "there was nothing on any of it about personal [*sic*], about me that I recall. It was all case related." *Id.* at 140.

Attorney Williams was angry but continued to prepare for trial. She testified that around February 21, 2013, Appellant "was asking for a misconduct motion, some type of prosecutorial misconduct motion to be filed to have [ADA Simon] removed from the case…." *Id.* at 130. Attorney Williams testified that she considered filing the motion and "had talked to [Attorney Flaherty] about it" but she felt "it would be counterproductive in my preparing for trial[.] … [Attorney Flaherty] felt that if we filed that[,] and it was granted and [ADA Simon] was removed[,] that possibly … another experienced trial lawyer would try the case …."[1] *Id.* The defense team decided against the

---

[1] Cases suggest that the removal of the prosecutor and/or that office may be an appropriate remedy where the prosecutor has demonstrated an actual
*(Footnote Continued Next Page)*

motion because "frankly the defense team felt that [ADA] Simon was too personally involved in the case and his animosity against [Appellant] was showing[. W]e were better off with him being on the case because he was a little bit off his game…." *Id.*

ADA Simon testified that Attorneys Williams and Flaherty misremembered the timeframe. ADA Simon agreed that he did call the attorneys about "an emergent situation saying you need to listen to these," but stated that the subject matter was the phone calls previously referenced in our direct appeal memorandum, *i.e.*, calls where Appellant indicated to his mother that the motion to withdraw his plea was a sham. *Id.* at 208. He "intended to introduce these at the post-sentence plea withdrawal" and, according to ADA Simon, "I did get a hold of Attorney Flaherty, and he did come to my office and listen to those calls." *Id.* at 209. He explained that those calls did contain disparaging comments:

> So there were nine phone calls[,] or eight or nine phone calls[,] …
> at this time, and [Attorney] Flaherty did hear all of those
> derogatory comments. Some were sexual in nature about
> [Attorney] Williams sleeping with the [j]udge. Bad mouthing
> [Attorney] Flaherty. Things like that. That was my recollection of
> what was on that tape. It was not pleasant some of those
> things[,] but then [Appellant] discusses with his mother[,] 'let's
> see what kind of chaos we can create by filing this motion. This
> could help you with a book deal.' Or whatever. And that was the
> real [*sic*] in my position[,] I was going to present that at the plea
> hearing to show his true motive as to why he was trying to pull

---

impropriety. *See, e.g.*, *Commonwealth v. Harris*, 460 A.2d 747, 749 (Pa. 1983).

his plea[,] not because of a manifest injustice or any other valid claim.

*Id.* at 209-10 (quotation marks added).

ADA Simon testified that he did make comments about Appellant's mother not liking Attorney Williams. The Commonwealth objected to having Appellant's mother visit the crime scene, and he spoke about the issue with Attorney Williams. He stated that Attorney Williams "started to go on a rant … about me listening to telephone calls. Her words were 'and on another note how dare you listen to calls between a mother and her son'…." *Id.* at 201 (quotation marks added). ADA Simon responded, "Because he wont stop talking[,] he keeps giving me good information … [Appellant's mother] does not like you anyway. I did say that." *Id.*

The conflicting accounts concerning these phone calls are the gravamen of Appellant's PCRA claim, as he argues that ADA Simon's actions were designed to interfere with the attorney-client relationship and warranted dismissal of all charges. We briefly address some other issues that bear on this claim. Attorney Williams testified to an encounter with ADA Simon regarding her motion to have Attorney Flaherty appointed. According to Attorney Williams, ADA Simon attended a public hearing before the county commissioners where "one commissioner [is] known to be a troublemaker and a big fiscal, you know, watchdog person, and ... it disturbed me [ADA] Simon went to that public hearing and objected and made an issue for [Attorney] Flaherty's office that the county should not fund [Appellant]'s death defense[.]" *Id.* at 125.

- 11 -

Attorney Williams said that she confronted ADA Simon, and he "replied that he had attended the meeting as a private citizen which is his right … but I thought it was a conflict." *Id.* ADA Simon disputed this. "I didn't [attend]. I never did that. I'd like to see the minutes from any meeting where that is even alleged. It's not my place. It would be our county solicitor who challenges whether the public defender's office represents or can be appointed to represent somebody. I don't recall ever doing that." *Id.* at 203.

After the hearing concluded, the PCRA court ordered Appellant to file proposed findings of fact, conclusions of law, and a proposed order, with the Commonwealth having thirty days to respond. Appellant instead filed a motion to amend the PCRA petition and requested a second evidentiary hearing. Appellant argued that, based on ADA Simon's testimony, he had demonstrated an "extreme animus, unrelated to his duties and responsibilities as the prosecutor of this case, towards [Appellant], [Appellant]'s mother, and [Appellant]'s trial attorney. … [ADA] Simon deliberately sought to prevent [Appellant] from having [c]ourt-appointed mitigation counsel and sought to interfere with the attorney-client relationship between [Appellant] and his counsel." Motion to Amend, 10/25/21, at ¶¶ 1-2. This allegation pertained to Attorney Williams' testimony that ADA Simon attended a meeting about Appellant's eligibility for court-appointed counsel. Appellant argued that ADA Simon tried "to interfere with [Appellant]'s right to counsel as protected by the U.S. and Pennsylvania Constitutions." *Id.* at ¶ 3. He added that the

hearing testimony established "that [Appellant] was denied assistance of counsel in his attempts to request to withdraw his plea." *Id.* at ¶ 4.

Appellant then filed his proposed findings of fact and conclusions of law, which included several matters that bore no relation to the amended petition. Appellant designated "claim one" as an allegation that post-sentence counsel Attorney Flaherty as well as direct appeal counsel ineffectively failed to advise Appellant of his right to counsel during post-sentence motions. The claim was centered on the fact that Appellant filed his motion to withdraw *pro se,* and his attorneys did not assist him or file a motion on his behalf. Appellant claimed that "the entire post[-]sentence, *pro se* process was a legal nullity" and that our Superior Court memorandum was likewise a legal nullity. Memorandum of Law, 3/24/22, at 6-7.

Next, Appellant designated "claim two" as comprising two subclaims, "claim two(a) and claim two(b)," both of which concerned his plea. *Id.* at 9. His first subclaim was that ADA Simon "committed overreaching during the pretrial stages" and that neither of his attorneys "understood the law as it pertained to prosecutorial overreaching. Counsel[] failed to provide adequate advice and failed to raise a claim of pretrial overreaching, as well as a violation of [Appellant]'s constitutional rights to a fair trial." *Id*. Subclaim two was that the plea was unknowingly, involuntarily, and unintelligently entered because counsel failed to inform him that he would have to pay the costs of prosecution. *Id.*

Appellant listed "claim three" as an illegal sentencing claim. Specifically, he complained that the sentencing order stated that Appellant must pay costs but did not list the specific costs to be paid.

"Claim four" was that ADA Simon committed prosecutorial overreach during the PCRA proceedings. The basis for this claim was that ADA Simon lied during his testimony.

## III.

The PCRA court issued an opinion on June 30, 2022. The court first denied the motion to amend the PCRA petition. The court determined that amendment was unnecessary as the claims that Appellant sought to add to the amended petition were either waived, as they could have been raised on direct appeal, or meritless in any event. Regarding the claims of overreach during the PCRA process, the court concluded that even if ADA Simon did overreach, that is "irrelevant to the trial and plea proceedings, which occurred over six years before the hearing on the PCRA [petition]." PCRA Court Opinion ("PCO"), 6/30/22, at 10.

Addressing the claim that his attorneys should have sought dismissal due to prosecutorial misconduct, the PCRA court concluded that Attorney Williams had a reasonable strategic basis "in failing to report the perceived prosecutorial overreach." *Id.* at 12 (citing testimony by Attorney Williams that ADA Simon was "off his game" and a motion would simply result in a more experienced prosecutor trying the case). The PCRA court also concluded that Appellant failed to establish prejudice, as "some other ADA would be

appointed to try the case, or the Office of Attorney General would try the case." **Id**. Thus, dismissal was not a possibility.

Appellant filed a timely notice of appeal and, as ordered by court, a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The PCRA court filed a Rule 1925(a) opinion, adopting its June 30, 2022 opinion and responding to additional allegations in the concise statement as warranted. Appellant now presents seven issues for our review, which we have re-ordered for ease of disposition:

[1]. Did the [c]ourt abuse its discretion or err as a matter of law by denying … Appellant the opportunity to amend his petition although the [c]ourt considered the issues of merit raised?

[2]. Did the [c]ourt abuse its discretion in failing to grant … Appellant the opportunity to conduct a second evidentiary hearing to enable … Appellant the opportunity to fully develop the record on the issues raised in the amended petition?

[3]. Did the [c]ourt abuse its discretion or err as a matter of law when it claimed all of the issues raised in the amended petition, as well as the issues raised in the supplemental petition, were without merit without conducting a requested evidentiary hearing?

[4]. Did the [c]ourt err as a matter of law or abuse its discretion when it stated Appellant was afforded and had counsel during the entire post[-]sentence stage[?]

[5]. Did the [c]ourt err as a matter of law or abuse its discretion by stating that post[-]trial misconduct is irrelevant to the issue [o]f pretrial misconduct?

[6]. Did the [c]ourt err on its limited finding of facts as the record contradicts the limited findings made by the [c]ourt and are not supported by the record?

[7]. Did the [c]ourt abuse its discretion or err as a matter of law when it applied the wrong standard of review as it pertains to prosecutorial misconduct?

- 15 -

Appellant's Brief at 16.

**IV.**

Our standard of review is well-settled:

When reviewing the denial of a PCRA petition, an appellate court must determine whether the PCRA court's order "is supported by the record and free of legal error."  Generally, a reviewing court is bound by a PCRA court's credibility determinations and its fact-finding, so long as those conclusions are supported by the record.  However, with regard to a court's legal conclusions, appellate courts apply a *de novo* standard.

To be entitled to relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the errors enumerated in 42 Pa.C.S. § 9543(a)(2), and that his claims have not been previously litigated or waived.  42 Pa.C.S. § 9544.  … An issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, … on appeal or in a prior state postconviction proceeding."  ***Id.*** § 9544(b).

To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth by the United States Supreme Court in ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).  This Court has recast the two-part ***Strickland*** standard into a three-part test by dividing the performance element into two distinct components.  To prove that counsel was ineffective, the petitioner must demonstrate: (1) that the underlying claim has arguable merit; (2) that no reasonable basis existed for counsel's actions or failure to act; and (3) that the petitioner suffered prejudice as a result of counsel's error.  To prove that counsel's chosen strategy lacked a reasonable basis, a petitioner must prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued."

***Commonwealth v. Drummond***, 285 A.3d 625, 633–34 (Pa. 2022).

Additionally, Appellant argues that the PCRA court erred by not granting him leave to amend his PCRA petition.  Amendments to a PCRA petition "shall be freely allowed to achieve substantial justice."  Pa.R.Crim.P. 905(A).  This

"liberal standard for amendment is essential because criminal defendants may have just one opportunity to pursue collateral relief in state court." *Commonwealth v. Crispell*, 193 A.3d 919, 930 (Pa. 2018) (citation omitted).

### A.

Reordered issues one through five all share the common complaint that the PCRA court erred in denying Appellant's request to amend his PCRA petition after the evidentiary hearing. As detailed *supra*, Appellant's motion to amend his PCRA petition and the accompanying proposed findings of fact and law raised several claims that were not advanced in the original petition, and which did not relate to the evidentiary hearing. Presently, Appellant abandons all but one of those claims in lieu of a complaint that the PCRA court erred in denying his request to hold a second evidentiary hearing focused on ADA Simon's conduct during the PCRA proceedings. Appellant claims that "the issue is now two-fold, one, [ADA] Simon did seek to interfere with Appellant's right to counsel[.] Two, [ADA] Simon was lying about his interactions with the Solicitor, to cover up his actions." Appellant's Brief at 64. As to claims one through three (including claim two comprising two subclaims), Appellant argues that, "[a]lthough the [c]ourt held Appellant was not permitted to amend[,] … the PCRA [c]ourt implicitly permitted Appellant to amend his petition by considering the issues…." *Id.* at 66. Appellant submits that, as a result, "the claims raised in Appellant's supplemental amended petition were preserved for appeal." *Id.*

- 17 -

The fact that the PCRA court explicitly denied amendment belies the argument that the court "implicitly" permitted amendment. *See* PCO at 10 ("[Appellant]'s Motion to Amend the PCRA Petition is **denied**.") (emphasis in original). The PCRA court simply decided, in the exercise of its discretion, that amendment was not warranted because all the claims were waived and/or meritless. Appellant does not explain why the PCRA court's conclusions in that regard were erroneous. The brief contains no discussion whatsoever addressing the PCRA court's conclusions that the other PCRA claims he wished to include were meritless, waived, or both. While amendment shall be liberally permitted, amendments are not self-executing. "[B]efore a petitioner may amend a PCRA petition, a petitioner must seek and obtain leave to amend because amendments to a PCRA petition are not 'self-authorizing.'" *Commonwealth v. Baumhammers*, 92 A.3d 708, 730 (Pa. 2014) (citation omitted). The PCRA court explicitly denied amendment, and Appellant cannot establish an abuse of discretion merely by stating amendment should have been permitted. He has therefore failed to develop an adequate argument challenging the PCRA court's decision and his appellate claims are waived for that reason. *Commonwealth v. Armolt*, 294 A.3d 364, 377 (Pa. 2023) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the

obligation of an appellate court to formulate [an] appellant's arguments for him.") (citation omitted).[2]

Appellant's reordered fifth issue stands on a different footing, as that claim pertains to "claim four" of the motion to amend and is focused on Attorney Williams' belief that ADA Simon attempted to have court-appointed penalty counsel removed. Appellant avers that the PCRA court abused its discretion in declining to permit further development of his claim, as he had no basis to pursue it prior to Attorney Williams' testimony.

_____

[2] Even if not waived, we would conclude that the PCRA court did not abuse its discretion in denying amendment. First, Appellant's argument that he was denied post-sentence counsel when the court entertained his *pro se* motion to withdraw his *nolo contendere* plea could have been raised on direct appeal. Hence, it is waived. 42 Pa.C.S. § 9543(a)(3). Appellant would have to raise this claim through a layered ineffectiveness claim, which he failed to adequately plead and prove. Moreover, he was not entirely denied counsel as Attorney Flaherty assisted in litigating his *pro se* motion.

Second, he waived his claim that his plea was unknowingly tendered due to ineffective assistance of counsel when his counsel failed to inform him that he was required to pay the costs of prosecution. Appellant called Attorney Williams at the first evidentiary hearing and no testimony was taken regarding the plea.

Finally, the claim that Appellant received an illegal sentence is not subject to waiver. However, we agree with the PCRA court that this issue is meritless. Appellant argued that the fact the sentencing order referenced the costs but did not specifically itemize the costs made his sentence illegal. While not bound by the Commonwealth Court's decisions, we "see no impediment to the clerk's performing that ministerial duty, if … the imposition of costs generally has been authorized by the trial judge." ***Richardson v. Pennsylvania Dep't of Corr.***, 991 A.2d 394, 397 (Pa. Cmwlth. 2010). Appellant has failed to develop an argument that a sentence becomes illegal by virtue of another governmental entity calculating the specific costs.

One may question why this topic would not have come up prior to the evidentiary hearing. In any event, we find no abuse of discretion. The thrust of Appellant's desire to hold a second evidentiary hearing was to offer additional evidence concerning Attorney Williams' claim that ADA Simon questioned Appellant's entitlement to court-appointed counsel. We note that the Commonwealth filed an objection to Appellant's first motion to amend due to, *inter alia*, noncompliance with 42 Pa.C.S. § 9545(d)(1)(i), which states, in pertinent part, that the petition "shall include a certification … stating the witness's … substance of testimony…." On February 2, 2022, the PCRA court granted Appellant 30 days "to amend the PCRA Petition in order to comply substantially to the filing requirements under Pa.R.Crim.P. 902." Order, 2/3/22 (single page). Appellant then filed a second motion to amend, which was substantively identical to the former motion and included additional certifications. Appellant included a copy of a response from the Open Records Officer for the Butler County District Attorney's Office. The letter indicates that Appellant requested copies of all correspondence between ADA Simon and then-County Solicitor Julie Graham. The response stated that that there was no written correspondence but indicated that there "was a verbal conversation." Exhibit to Motion to Amend, 2/22/22. Appellant's motion stated that Appellant left two messages for Ms. Graham but she did not reply.

It is unclear what the "verbal conversation" entailed. But even if we were to assume that the conversation was relevant to his claim of interference with the attorney-client relationship, the PCRA court did not abuse its

- 20 -

discretion.  Ms. Graham did not respond to Appellant's requests, and he thus failed to include any kind of indication as to what, if anything, she could add. Appellant apparently did not pursue any other kind of recourse, such as a subpoena or a court order.  The PCRA court therefore did not abuse its discretion in determining that a hearing was not warranted, as it would amount to a fishing expedition.

In the alternative, even if the response from the Open Records Officer and Ms. Graham's failure to respond warranted some further evidentiary development before the PCRA court, we would find that Appellant has failed to establish any kind of prejudice.  Even if we accept that Appellant could establish that Attorney Williams' accusation was correct, Appellant makes no attempt to explain how ADA Simon's testimony at the PCRA hearing could support a cognizable claim under the PCRA.  Appellant merely insists that ADA Simon lied at the PCRA hearing.  We fail to see how that would support a claim under the PCRA, as ADA Simon's conduct at the PCRA hearing could not have any bearing on what occurred prior to Appellant's plea.  "A court may not summarily dismiss a PCRA petition, however, when the facts alleged in the petition, if proven, would entitle the petitioner to relief."  ***Commonwealth v. Barbosa***, 819 A.2d 81, 85 (Pa. Super. 2003) (internal quotation marks and citation omitted)).  Conversely, a court may summarily dismiss a petition, or in this case deny a hearing, when the facts alleged would not entitle Appellant to relief.

At most, establishing that ADA Simon did attend the hearing would undermine his credibility concerning the testimony surrounding several of these events. But, as explained *infra*, we accept — for purposes of this appeal — that ADA Simon did engage in conduct that would arguably warrant disqualification from the case had Attorney Williams sought that relief.

**B.**

We now address Appellant's final two issues, both of which concern the claim raised in his original amended PCRA petition: that his counsel ineffectively failed to seek dismissal due to prosecutorial misconduct. Beginning with the first of these issues, Appellant submits that the PCRA court erred in its limited findings of fact. We agree that the PCRA court's findings are limited, and it did not make any explicit findings of credibility or fact. Specifically, Appellant takes issue with the PCRA court's reference to a CD included as part of the record in this PCRA proceeding. The PCRA court opinion states: "A hearing … was held on July 29, 2020. The following day, the Commonwealth filed a Motion for Release of Evidence in the form of a CD, which was granted on July 31, 2020. **That CD contained the audio of the phone calls at issue**." PCO at 2 (emphasis added). Appellant argues that this finding is not supported by the record.

We agree. As set forth in detail *supra*, ADA Simon testified that he called Appellant's attorneys concerning recorded jail calls. However, Appellant, Attorney Flaherty, and Attorney Williams all stated that this phone call must have occurred prior to the entry of the *nolo contendere* plea.

- 22 -

Attorney Williams was adamant that she attempted to contact Appellant due to a concern that he had confessed or made some other type of damaging statement, which would seriously impact her trial preparation. Attorney Flaherty's testimony was substantially the same regarding the timing. ADA Simon disagreed with all three witnesses.

The CD that is the subject of the Commonwealth's motion references "nine recorded phone calls," which would be the nine phone calls referenced in our direct appeal decision regarding Appellant's motive for filing his motion to withdraw the plea. Those calls were all made **after** the entry of Appellant's plea. Appellant's PCRA argument clearly pertained to the other phone calls, which precipitated Attorney Williams' urgent phone call to the prison and Attorney Flaherty's visit to ADA Simon's office.

To the extent the PCRA court's ruling could be interpreted as an indirect finding that ADA Simon's testimony was credible, that conclusion cannot be reconciled with the PCRA court's conclusion that Attorney Williams had a reasonable strategic basis for declining to seek disqualification. The PCRA court opinion states that "counsel had a valid reason for the failure to report the alleged overreach." PCO at 7. The PCRA court easily could have said that there was no arguable merit to a claim of disqualification on the grounds that ADA Simon did nothing to even plausibly support such a motion. Thus, we agree that the calls "at issue" are not those nine recorded phone calls.

We therefore resolve the first issue by accepting *arguendo* that ADA Simon's conduct may have supported a meritorious motion to disqualify.

Commonwealth's Brief at 8 ("Even assuming *arguendo* that some degree of misconduct may be deemed to have taken place[,]… [Appellant] has still failed to make out a valid claim for PCRA relief."). Accordingly, we can now address whether the PCRA erred as a matter of law when it denied this claim.

Initially, we agree with Appellant that the PCRA court's analysis does not address Appellant's claim. "[T]he proper standard of review … as it relates to misconduct would be to dismiss the case, not reassign the case to another prosecutor." Appellant's Brief at 59. He maintains that a motion to dismiss would have succeeded based on ADA Simon's conduct. We agree with Appellant that his attorneys could not have a reasonable strategic basis for declining to file a motion to dismiss if that motion were clearly meritorious. For instance, suppose a defendant enters a guilty plea but the attorney overlooks a motion to suppress that is clearly meritorious and would result in suppression of all evidence. The fact that the guilty plea was otherwise favorable would not preclude relief. **Cf. Kimmelman v. Morrison**, 477 U.S. 365, 382 n.7 (1986) (observing that defense attorneys would not "sandbag" meritorious claims by deliberately failing to raise them in hopes of prevailing on collateral review; "No reasonable lawyer would forgo competent litigation of meritorious, possibly decisive claims…."). This dynamic is further demonstrated by **Hill v. Lockhart**, 474 U.S. 52 (1985), a case analyzing a claim that counsel ineffectively advised accepting a guilty plea by supplying incorrect advice on parole eligibility:

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Id.* at 59.

Analogously, here, the alleged error is that counsel failed to recognize a clearly meritorious motion to dismiss.[3] Thus, we agree that the PCRA court erred by concluding that Attorney Williams had a reasonable strategic basis for not pursuing a motion to dismiss. We would agree that Attorney Williams' decision was designed to effectuate Appellant's interests if the only consideration was whether to not file the motion (and proceed with ADA Simon as the prosecutor) or file the motion (and potentially risk the assignment of a

_____

[3] Our analysis is different from *Hill* with respect to the prejudice inquiry. In *Hill*, the petitioner claimed that he would have proceeded to trial in lieu of accepting a plea had he been correctly advised on parole eligibility. While Appellant did ultimately accept a plea, as framed, his options were not limited to either pursuing a motion to dismiss, accepting the plea, or proceeding to trial. There is no indication that the Commonwealth conditioned the plea bargain on not filing any such motions, and we express no opinion on whether the Commonwealth could do so. For our purposes, the prejudice component will be established if a motion to dismiss is clearly meritorious.

- 25 -

more experienced prosecutor). Those options do not address Appellant's contention that Attorney Williams should have sought complete dismissal.

For the following reasons, we affirm the PCRA court's conclusion that Attorney Williams was not ineffective on a different legal basis. *Commonwealth v. Parker*, 249 A.3d 590, 595 (Pa. Super. 2021) (noting that "this Court may affirm a PCRA court's order on any legal basis"). We agree with the Commonwealth that Appellant has failed to establish that the law supports a motion for dismissal under these circumstances. *See Drummond, supra* at 645-46 (concluding that assertion that counsel should have objected to a jury instruction's hypothetical concerning reasonable doubt had arguable merit but concluding that "counsel was under no reasonable obligation to raise a challenge to the instruction, as any such objection would have lacked a then-existing legal foundation"). As the Commonwealth notes, "[Appellant] cites no authority, however, and the Commonwealth is aware of none, that stands for the proposition that double jeopardy principles could compel preemptive dismissal of a case on the basis of alleged overt prosecutorial overreach prior to the attachment of even a single incident of legal jeopardy." Commonwealth's Brief at 11. We agree, and we reject Appellant's argument that caselaw clearly supports a motion for dismissal under these circumstances.

Appellant must establish that his claim for dismissal is so strong that no competent attorney would have failed to file it. *See Premo v. Moore*, 562 U.S. 115, 124 (2011) (explaining that the merits of the motion must be so

clear that "no competent attorney would think a motion to suppress would have failed"). We thus assess the legal arguments Appellant develops in support of his claim. Appellant maintains that "the instant case was indeed subject to dismissal with double jeopardy protections." Appellant's Brief at 48. He largely relies on *Commonwealth v. Anderson*, 38 A.3d 828 (Pa. Super. 2011) *(en banc)*, wherein this Court affirmed an order dismissing a case on double jeopardy grounds due to pretrial prosecutorial misconduct, and *Commonwealth v. Byrd*, 209 A.3d 351 (Pa. Super. 2019), where this Court upheld the trial court's decision to bar retrial where the prosecutor spoke to a potential defense character witness and discussed information learned from jail recordings. We conclude that neither case supports a motion for dismissal for an alleged attempt to interfere with the attorney-client relationship.

In *Anderson*, Anderson's jury trial convictions were reversed due to prosecutorial misconduct during closing argument, but Anderson was not granted discharge on double jeopardy grounds due to that misconduct. *Anderson*, 38 A.3d at 831. Instead, the matter was then relisted for retrial. The case involved underage witnesses and Anderson raised an issue concerning their competency. During the retrial phase of the case, Anderson alleged that the prosecutor had inappropriately coached the witnesses in the past, and the trial court issued an order barring the prosecutor from interviewing the witnesses ahead of the competency hearing unless a psychologist was present and certain records were kept. At the competency hearing, a witness gave answers indicating that the prosecutor had met with

the witness in violation of the court's conditions. The trial court determined that the prosecutor's "actions constituted an overall pattern of misconduct designed to violate [Anderson]'s right to a fair trial[.]" *Id.* at 839. The Commonwealth appealed and we affirmed, holding that "the prosecutor intentionally acted to prejudice the defendant to the point of the denial of a fair trial." *Id.* at 840. The closing paragraph again concluded that the "prosecutor committed intentional misconduct to deny [Anderson] a fair retrial." *Id.*

Parts of *Anderson* support Appellant's claim. We authorized dismissal on double jeopardy grounds based on prosecutorial misconduct occurring before the trial itself. As the four dissenting judges opined, an unfair trial could not have occurred since the second trial had not yet commenced. *See id.* at 843 (Olson, J., dissenting) ("That the misconduct at issue here took place and was discovered pretrial is significant—[Anderson] was not subjected to an unfair trial as his new trial had yet to occur."). In rejecting this theory, *Anderson* supports Appellant as the two are arguably in the same position: like Anderson, he cites prosecutorial misconduct occurring pretrial.

Nevertheless, at the end of the day, *Anderson* involved a case in which the defendant had formerly proceeded to a trial at which jeopardy attached. Seeking dismissal on double jeopardy grounds definitionally requires that the defendant have been placed in jeopardy. As the Commonwealth correctly observes, jeopardy had not attached at the time Appellant claims that Attorney Williams should have filed a motion seeking dismissal on double

jeopardy grounds. "In Pennsylvania, jeopardy does not attach and the constitutional prohibition against double jeopardy has no application until a defendant stands before a tribunal where guilt or innocence will be determined." ***Commonwealth v. Vargas***, 947 A.2d 777, 780 (Pa. Super. 2008) (citation omitted).

This distinction is, in our view, dispositive. "The constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." ***Green v. United States***, 355 U.S. 184, 187 (1957). "The underlying idea … is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity…." ***Id.*** Thus, once a defendant is placed in jeopardy, the trial should result in a decision by the fact-finder, whatever the result may be. ***See Oregon v. Kennedy***, 456 U.S. 667, 673–74 (1982) (referencing "the defendant's valued right to complete his trial before the first jury"). Appellant's argument overlooks the fact that he had not proceeded to trial. As there is no second trial to bar here, Appellant has no viable double jeopardy claim supporting dismissal. The same is true of ***Byrd***, where the trial court barred retrial when "on the evening of the third day of the trial[, the prosecutor] contacted … a potential character witness for [the defendant]." ***Byrd***, 209 A.3d at 354.

Appellant is correct that our Supreme Court has held that our constitution offers greater protections in this arena. *See Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992) (holding that our constitution's double jeopardy provision "prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial"). But, again, the expanded protections all address whether retrial is barred. *See Commonwealth v. Johnson*, 231 A.3d 807, 826 (Pa. 2020) ("It is established that the jeopardy prohibition is not primarily intended to penalize prosecutorial error, but to protect citizens from the embarrassment, expense and ordeal of a second trial….") (quotation marks and citation omitted). Appellant was simply never subject to a trial or any attachment of jeopardy at the point at which the motion, in his view, should have been filed. Even if we assume there is arguable merit to his claim that a motion to dismiss in these circumstances had some prospect of success, the foregoing analysis demonstrates that the claim was clearly not a guaranteed winner. For Sixth Amendment purposes, that is the relevant inquiry. *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) ("[T]he failure to file a meritorious suppression motion does not constitute *per se* ineffectiveness. For such a failure to constitute deficient performance, the meritorious nature of the motion must be so plain that no competent attorney would think a motion to suppress would have failed.") (cleaned up). Counsel has no obligation to file motions

that "would have lacked a then-existing legal foundation." ***Drummond***, ***supra*** at 646.

Finally, we add that the double jeopardy precedents do not encompass Appellant's claim in one other respect: the claim in ***Anderson*** involved misconduct designed to deny a fair trial through the subversion of the truth-determining process. Appellant thus faces an additional hurdle, as nothing in Attorney Williams' testimony establishes that her relationship with Appellant was actually undermined by ADA Simon's conduct, and Attorney Williams would be required to immediately inform the trial judge if some external influence prevented her from fulfilling her professional responsibilities to her client. Relatedly, Appellant does not establish that ADA Simon's actions were specifically intended to undermine the attorney-client relationship or that his conduct was so reckless that it was substantially likely that his relationship with his attorneys would be undermined. The only conclusion that the record supports is that Attorney Williams had enough to present a motion to disqualify ADA Simon from participation. All other impediments aside, that is a far cry from a finding that ADA Simon engaged in such severe misconduct that society's interest in prosecuting crime should not be weighed against the alleged misconduct.[4]

_____

[4] Our research indicates that claims for dismissal based on the attorney-client relationship tend to be analyzed as a violation of the Sixth Amendment. ***United States v. Singer***, 785 F.2d 228, 234 (8th Cir. 1986) ("To establish a [S]ixth [A]mendment violation, a criminal defendant must show two things:
*(Footnote Continued Next Page)*

We therefore conclude that Attorney Williams had no obligation to raise a claim that the law did not, and does not, support. We therefore affirm the denial of Appellant's PCRA petition.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/2/2023

---

first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant."). Courts take varying approaches to whether and when a showing of prejudice is required, to say nothing of whether dismissal is an appropriate remedy. **See generally Shillinger v. Haworth**, 70 F.3d 1132, 1140 (10th Cir. 1995). We express no opinion on the validity of any of these points, but merely highlight them to further demonstrate that Appellant's claim is not clearly meritorious.